Good morning, your honors. Mark Ellis, Ellis Law Group, LLP, Sacramento, California, for what we are now calling the guild, the appellants. With me is David Castro. He's an attorney in my office. Good morning. Good morning. So we have three appeals in front of the court at this point in time. As the court can see, I only briefed one of those. That was the appeal on the attorney. It's still a G. I don't know why they didn't call it California Farmers Association to avoid confusion. You're talking about the guild? Yeah. So when you use initials, it's still a G. You're talking about when they call themselves CSG? Yeah. Well, that really has kind of, here's one of the interesting points about this, your honor, is that, you know, through the sands of time, from when this case started, and these cases all started, you probably can tell, back in 2012, in the state court over in Sacramento, and then went into the federal court in Sacramento with what we now call Fed Grange 1. That's what these appeals arise out of. You probably understand there's a Fed Grange 2 that is still going on, that is still litigating these issues. That's in front of Judge Shub 2. Okay, but what do you want to talk about? I mean, we don't have that much time here. Do you want to talk about the attorney's fees? Do you want to talk about the trademark framework? What is it exactly that you want to bring to our attention here? Sure, Judge Murphy. What I'd like to talk about is the attorney's fees under 15 U.S.C. section 1117A. Are you prepared to talk about whether or not the district court got it right when they found that the plaintiff's mark was protectable, or are you not going to talk about that at all? I think that that is a debatable and But that's not your issue. and tenable issue. I think that the appeals from that are not frivolous because I think that there are, you can make the argument under FRCP 56 that there were tribal issues of fact. I mean, one of those issues, for example, was that California State Grange was incorporated under that name in 1946 and continued to use that term Grange within its corporate name for, you know, the 50 years after that. You know, you argued that that was acquiescence, and I just can't see why, because they were then part of the National Grange, and they didn't lose their charter. I can't remember whether that's the right verbal formulation, but they didn't leave the Grange, the National Grange, until 2013. So I can't see why anything before 2013 shows acquiescence. Well, I think that that is a plausible argument also, Your Honor. All I'm saying is that during that intervening period of time, you know, no one from the National Grange came to the California State Grange and said, you know, you're using this in your corporate name, not simply as Well, why wouldn't they? I mean, it's like we've got a Sears Roebuck store in town, and it's part of the National Sears. Now, if they lost their franchise or whatever it is, and they still kept calling themselves the Sears store, that is when it would start to be a problem. I understand. And that's why I would like to address the arguments under 15 U.S.C. 1117A. Okay. And I'm not trying to dunk the question. I just think the stronger arguments here relate to the attorney's fees. Okay. And that's what I'd like to focus my attention on. And, by the way, can I have five minutes? Oh, sure. I'll try and help you. Okay. That clock is counting now. Yeah. Thank you. So we know that the kind of sine qua non, kind of the touchstone is the term exceptional circumstances. We know, and I've briefed this, that, you know, this court in Sun Earth, following the United States Supreme Court decisions, now uses the totality of the circumstances as the standard. And my point in my briefing and my point this morning is that I just don't think that Judge Shub looked at the totality of the circumstances when you look at his order. Why wouldn't that be worse for you? Because Sun Earth makes, gives the judge more discretion. I think that Sun Earth does. And I think it also, it clarifies the standard of review for the court to preponderance of the evidence. But here's what Judge Shub didn't do. And what Judge Shub didn't do is go through the evidence that had been put forth by the attorneys who then represented the guild and make a determination ultimately as to whether or not, and I just want to, I want to go through this. I don't think there's at least, I don't think there's any doubt that the evidence does not show that there was malicious conduct by the guild. I don't think there's any, I don't think there's any doubt that the evidence does not show fraudulent conduct by the guild. I don't think there's any doubt that the evidence does not show deliberate conduct, as that term is used in the cases interpreting 1117. I think the question here, and this is really what Judge Shub found, was that there was willful conduct. And the question is, I think to start off before I start talking about the evidence that you have in front of you, is that the court, the courts, I think all across the country and here in the Ninth Circuit, say, although willful doesn't have to be overwhelmingly bad, it doesn't have to, it doesn't have to permeate the case in some sense, there is still some connotation of deceptiveness in that term. I don't know about deceptiveness, but the word fraudulent would certainly suggest deceptiveness, but deliberate, the words deliberate and the word willful, and they're connected by an or, so either one will do. All they would seem to connote to me is on purpose and knowing you shouldn't and calling yourself by the name of an association that you're no longer part of. Why wouldn't that be on purpose and knowing you shouldn't? So this is where, Your Honor, I think the timeline of what happens here comes, becomes really important, and this could be a long-winded way of answering your question. I hope I don't annoy you by doing that, but let me see if I can do it. So the motion for summary judgment is filed, is determined in July of 2015, and you can find that at the excerpts of record at page 616 at set. And in his motion for summary judgment, where Judge Shub grants in part, he finds that using the marks where Grange in the marks was infringing. Shortly thereafter, the National Grange dismissed the remaining claims for damages, and there's some indication also that that was going to include attorney's fees. I'm not going to argue that too hard. But he then enters a permanent injunction and says the defendants are enjoined, open quote, from using marks containing the word, open inside quote, Grange, close inside quote, close quote. That's at excerpts of record 592 and 597. At the same time, the court denied the use, denied an injunction as to terms such as Granger, CSG, and CG, and that's at excerpts of record 594. And the court found that is because they had either not been raised in the complaint or had not been raised in the summary judgment. And you can find that in the court's record at excerpts 596 through 597. The appeals, the other two appeals that are before you today, then get brought, the cross appeal and the appeal shortly thereafter. And this is the point that I'm getting at. On October 30th, 2015, Your Honor, the guild moved for a stay of the injunction. So that's within, say, two and a half months from when the summary judgment comes down. It's within about a month and a half from when the permanent injunction gets entered. And the case law is in the briefs with respect to there is, when you are, when you have a stay and you've asked for a stay, the question becomes whether or not during that time period, while that is pending, willfulness in terms of continuing to go forward or not to, in this case, remediate, which is really what this case is about, the failure to remediate and take Grange out of 50 years of business On the website, there was still a reference to the history going back to the 1800s. And then the other was when the receptionist answered the telephone at the guild's office. I said Grange. Yeah, she answered it in a way that might mislead people who were calling. Right. I mean, how hard is it to make those two changes? Well, so with the website, what you're going to see in the evidence that's in the, that was part of the record in front of Judge Shub was that you have Rick Keele's declaration and you have Jim Hoag's declaration. These are people that work for the guild. And, you know, they talk about the efforts that they were doing to try to get this done, to remediate, and to dig these things out. And so one thing is But I read the district court's order on this point as essentially concluding that your client was dragging its feet in not moving faster to comply with the terms of the injunction. I absolutely agree with you. I think that's, and that's really the point that I'm making in my brief. And I'd like to kind of finish that right here. Maybe I'm not succinct enough. But the point is this. The order denying the request for a stay does not come down until January 12th of 2016. And, Your Honor, 28 days later, the contempt motion comes in. And do you see my point? My point is, is that we're talking about a very short time. My point is, your clients weren't dragging their feet. That's right. That's exactly right. You know, I don't see that. I read the explanations, like, well, we had to wait for a board meeting. And my first thought was, if a judge tells you to stop doing something, and you don't want it to mean stop doing it right now, you've got to get the judge to agree to let you wait until it's convenient and practical. Otherwise, what you do when the judge says stop doing something, you hold an emergency board meeting. People hold emergency board meetings on all kinds of things all the time in all kinds of organizations. Right. And if the judge says stop, you stop. And if the board members say we don't want to be rushed, we'll do it in the ordinary course. You tell them, then we might go to jail. Right. So in opposition to the contempt, Your Honor, I mean, I guess I must just be a terrible advocate that I'm just agreeing with everything that you folks are saying. No, I think you're being a terrible advocate, but I guess my concern is the same as Judge Kleinfeld. I mean, you know, as former practicing lawyers, we've all been in the situation of conveying to a client that here's what the court has ordered, and then being somewhat disappointed that the client didn't do what the court told it to do as quickly as the court expected it to get done. So we don't have any of that in the record in Fed Grange 1, except in the excerpts of record here, Your Honor, if you go to, for example, pages 435 or to — I'm just going to read what I think are the salient points, Your Honors. But if you go to ER 435, you're going to see that there is testimony and argument in front of the court that they could not change or take the name out of the word — out of the corporate name Grange without a vote of the entire guild. And so at ER 444, you see that they are — there's evidence of how they're attempting to comply. At ER 460 through 462, you will see the disclaimer that they used in their communication saying that they were not the Grange. If you look at ER 533 through 535, you'll see the declaration of Attorney Jennifer Wallace that talks about the communications that she was having. And you saw the salient points that I put in my brief. For example, in the January 12, 2016, order, Judge Shub himself says, look, they're attempting to comply. I mean, he states that. He says that was one of the reasons why he denied the stay, because what he said was, it looks like you folks are actually working diligently to comply with my order. You'll see that there are letters. ER 538, you'll see that that's an October 5th. And in light of all that, maybe it's worthwhile talking about the standard a little bit, because, I mean, at the end of the day, the district judge who made all those rulings that you're citing ultimately looked at all the facts and awarded the attorney's fees that he did. And while your argument — while you support your argument with factual matters in the record, the fact is we're looking at what the judge did on the ground at the time, and why do the facts that you're citing now support us overturning or reducing as a matter of law what the judge did on the fees? So my answer, Judge Murphy, is that what we have in the record is him looking at — he goes through all the things that the National Grange, the facts that they brought. What you don't see in the record, in the three pages where he talks about attorney's fees, are all the facts that I'm giving to you. And, you know, as a former law clerk of appellate court that's written the bench briefs that you have in front of you, I mean, I understand that — I'm not saying that there has to be a standard everywhere where a court completely sets forth, you know, ad nauseam all the factors that looked at. But we don't see any of these here. And, you know, we have two — It looked to me like what especially ticked the judge off and made him think this was willful and deliberate misconduct was at least two things that he mentioned. One was that even though the guild told the court it had not solicited any membership dues using the name Grange, actually the billing statements were for Grange dues. And the other one was that the guild identified itself as being formerly known as the name Grange, while formerly known as means we're the same outfit, we've just changed our name, and they're not the same outfit. I don't disagree. And that — it looked to me like the judge was especially influenced by those two things that he articulated clearly. The problem was, is that they were not focusing on the time period. And so there are other excerpts in the record, and I just want to give these to you Well, still, you can infer from what somebody does today what he was doing yesterday. It may not be as compelling as showing what he did yesterday to prove what he did yesterday, but it's something you can infer from. So the point becomes, because the attorney's fees, Judge Murphy, just to get in, I want to answer your question or observation, too, Judge Kleinfeld. The attorney's fees are really from two pieces of litigation. One is the contempt motion, right, which was denied. And, of course, you know, the case law that is developed here says you don't have to win all the time to get your attorney's fees. But it was denied. And, in fact, during the hearing that occurred on March 7th, Judge Shub says, well, maybe I made a mistake. Maybe my injunctive relief was too narrow. He repeats that again, by the way, on April 18th. So the second thing it was based upon was the renewed injunction motion, which was denied mostly. And so, again, these were not factors that you see on the record, and I see I'm down to four seconds, notwithstanding asking for five minutes. I'll give you a way to do that. And I apologize. Mr. President, are there any other questions I can help you all with? I don't think I have anything. Why don't we hear from the other side, and then I'll give you a couple minutes. Okay. Thank you, Your Honor. Good morning. Good morning. May it please the Court. My name is Jim Bycoff, and I'm representing the National Grange of the Order of Patrons of Husbandry and the California State Grange. And in this appeal proceeding, I just want to mention that the National Grange was founded in 1867. It is the oldest fraternal cooperative. Counsel, we're very familiar with the record. If it will save you some time. Okay. And so this morning I came prepared to speak about the appeal on the denial of the two affirmative defenses in Judge Shub's order, but apparently those are not being contested. I'm still. I think they're being contested, but in briefing and not in oral argument this morning. Okay. We're certainly not going to declare them waived. They're not treated as waived. Okay. So I can comment on that and also on the cross appeal. Yeah, you can talk about anything that's in the briefs. Okay. So I should be five or six minutes, and then Mr. McDonald, Bruce McDonald, who's my partner, will take up the rest of the time with the motion on the attorney fees, and I think whatever time we have left we'll use in rebuttal. So when do you want to stop? You don't get, well, you don't get rebuttal. Yeah, you don't get rebuttal. Okay. So five minutes. So stop you at five minutes. I think I can do it in five minutes. Oh, you're going to do it in five. Okay. So I'll stop you at about 13 minutes. Okay. So we believe that if the district court properly considered the Guild's affirmative defense, that the mark Grange is merely descriptive and lacks secondary meaning. The Guild argues that the district court only considered whether the Grange term was generic and not merely descriptive. Well, let me ask you about that, because the district court starts out by declaring that the mark is protectable because it's not generic. Right. But as I understand trademark law, and it's a tricky area, a non-generic mark is not necessarily protectable. Correct. But here the- Tell me where the district court, as I understand it, then we have to ask, we have to determine if it's inherently distinctive or descriptive and has secondary meaning. And the district judge didn't do that, did he? Your Honor, the reason for that is that a registered mark that becomes incontestable is immune to challenge on certain grounds, including descriptiveness. The Park and Fly case- I thought there was a 5-year limitation on, in other words, you have to register it within 5 years. Oh, yeah. These registrations go back 20 years. Okay. So there's no contest among the parties as to whether or not the mark is registered. No. And besides that, Your Honor, the name and mark Grange has been used since 1867, and the mark has acquired distinctiveness over 150 years of use, so I don't think there's any question there. The second affirmative defense that's being contested is the- Would you then say as to the second element that it's either descriptive or has acquired a secondary meaning? Well, I would say that the mark is certainly not descriptive but has acquired a secondary meaning. We have approximately 20 registrations for the Grange mark. None of them were objected to by the Patent and Trademark Office on the grounds of descriptiveness. The word has functioned as a trademark and a service mark since 1867, and we have licensees. We have, you know, used the mark on all sorts of products and services. Okay. The second defense was on the affirmative defense of acquiescence, and this was, I think, referred to a little bit by Mr. Ellis. I'm not sure based on our conversation with him. It sounds like, at least to me, that that issue sort of falls out of the case given the fact that until whatever the date was in 2013, I guess, when the charter was revoked, clearly they were an affiliated charter member of the nationwide Grange. Okay. I don't think I'd spend a lot of time on acquiescence. Okay, I won't. Just to say that Mr. Ellis argued that we did not cite the seller agency counsel decision. We relied on Westinghouse, and actually seller agency did not overrule on the factors to be evaluated on acquiescence. And, in fact, here, both latches and acquiescence require an inexcusable delay. We don't have the inexcusable delay since it was only four or five months to bring the suit after notice. And it looked like your client moved pretty quickly when things kind of blew up between the California folks and the national Grange. Yes, Your Honor, I believe we did. So if there are no other questions, I would move to the cross appeal. Sure. Okay. On the cross appeal, first of all, I would say that the guild never responded to our brief, and under Federal Rule Appellate Procedures 28, it requires the guild to file a brief in response to our opening brief. They didn't do that, so I would assume the decision would be made on the basis of our brief and the record. I'm happy to make a few comments on that. First of all, I think the district court, I think, erred in refusing to enjoin the defendant from using confusingly similar marks and unfairly competing against the national Grange by capitalizing on the party's former relationship. When I went to advocacy school, they told me, if you've got a brief and a record and nothing in response, you ought not risk getting the court upset with you by talking about. Well, then, I'm happy to sit down. Okay. I have a question for you. Go ahead. Thank you, Your Honors. Don't sit down yet, Mr. Bicamp. Don't sit down yet. I've got a question about the attorney's fees. Are you on attorney's fees or is your co-counsel? No, Bruce McDonald is going to handle attorney's fees. Okay. Okay? Thank you again. Thank you. May it please the Court, I'm Bruce McDonald, Jim's partner. And, Your Honor, on attorney fees, we'd like to say that this has never been about mere foot dragging. This is about gaslighting, sandbagging, and stonewalling. That's an entire false narrative. What does gaslighting mean? Gaslighting. I've never known what it means. Gaslighting means throwing false facts at people to make them think that they're crazy in believing their own eyes. That's what it is. And that's what we have going on. That's the Groucho Marx quote. Okay. Now I know what it means. Are you going to believe me or your own eyes? This is a frivolous appeal. Look, let me ask you about a factor here. Yes, Your Honor. Something that bothered me is if the California Association can only change its name by a vote of the full membership, why doesn't that cut strongly against deliberateness? It bothers me because it would take time to conduct a vote of the whole membership. Well, Your Honor, the short answer to that question is once you've been ordered to do something by a federal judge, you don't need to have that order ratified by your members. Some orders are impossible. If the judge orders you to jump six feet high and you can't do that, then you can't be held in contempt for your failure to do that. Well, all right, let's assume that's true for purposes of argument. The fact here is that the defendants went to the plaintiff's members, to all of the California Granges, and pointed to the records of the California Secretary of State and said, look, we are the California State Grange. So look to the Secretary of State. Wait, you're not addressing my question. Let me rephrase it. Is it true that under their articles and bylaws they needed a vote of the full membership to change their name? And if so, why shouldn't their failure to act before that vote be treated as non-willful and non-deliberate? Well, Your Honor, no, we do not agree that this was required. And the machinations that they went through with their ‑‑ with this process are all subject to ‑‑ You're saying they did not need a vote under the articles and bylaws? No, Your Honor. We don't believe that they did. But even if they did, that was only one factor. You don't happen to have any quotes one way or the other? No. So when you say they didn't need a vote, you can't point to anything? Well, Your Honor, we simply ‑‑ we are relying on the evidence of record there. And the articles and bylaws aren't in the evidence? They are in the evidence. And we don't see how ‑‑ Are or are not? They are, but we are simply referring to the defendant's citations in that respect. Well, again, what's the standard here? I mean, Judge Kleinfeld may be entirely correct, but the district court found otherwise and awarded the fees. So can we look at this de novo and make a different decision? Is he entitled to deference or what? Well, Your Honor, we have the Sun Earth case, which came out in 2016. Well, that gives the evaluative standard. Well, what's the review standard that we have to employ here? Well, the review standard should be whether there was an abuse of discretion, clearly. So is the failure to ‑‑ or the award of attorney's fees in light of the good faith efforts of the California Guild to get its officers and members together to vote an abuse of discretion? No, Your Honor. Why not? Well, because, Your Honor, the evidence of the defendant's malicious and willful conduct was abundant in the record, especially the declaration of Jerry Allen at the CG excerpt of record 348 to 352. So we have really an extraordinary course of conduct here, Your Honor. And even if the defendants were required to go through an ornate process with their members in order to formally change the name, they were using this as a reason to advertise to the party's members that they were the successor to the California State Cranes by reason of the articles of incorporation that they now claim that they were unable to change. So that in the light of the totality of the circumstances, there's no question that it was willful, and the district court so found when the court found that it was a willful and deliberate disregard of the plaintiff's rights. Did the judge ever comment on the thing that kind of stuck in my mind about the need for a vote of the membership? Your Honor, the judge was properly concerned with the way that the defendant was using this, not as a means of foot dragging, but literally stonewalling. You didn't answer my question.  Listen to the question. I want to know if the judge commented on the need for a vote of the full membership to change the name. I don't recall that exact quotation, Your Honor. I recall that the judge did talk about the fact that the defendant was using this fact as an excuse to cause confusion, mistake, and deception among the party's members. And the more the more... No question, the judge thought that everything the California organization was doing was a bunch of foot dragging to evade compliance responsibilities. That was plain. And what I wanted to know is, I'm focusing more on, was compliance possible? Compliance was possible, Your Honor. Compliance was possible because it wasn't the mere existence of the Articles of Incorporation that were the real evidence of willfulness. It was how the defendants marketed and advertised that fact. They said, look at the California Articles of Incorporation. Look at the records. This is in the Jerry Allen Declaration, where the defendants are advertising. They say, look at the Articles of Incorporation. We are the successor to the... These were the things that they were saying, that Mr. McFarland continues to be the authorized and lawful representative of any California grange that hasn't expressly disaffiliated from our organization, that the local granges would suffer overwhelmingly adverse tax consequences if they disaffiliated from our organization and joined this stranger, interloping, latecomer organization that they called Komsky's organization. That the relationship between the guild and the local granges is the same as it always has been. Look to the Articles of Incorporation, they kept saying in all their advertisements. So I take it that when the split occurred and they came up with the name California State Grange, they did not change their existing Articles of Incorporation and bylaws? No, clearly not. In fact, after the September 2015 injunction, they adopted the acronym CSG. They copied the grange's website. They went to extraordinary lengths to inculcate the impression that they were the successors to the California State Grange, including stating so overtly and repeatedly. So their argument makes no sense because they argue that the district court should have considered a totality of circumstances when the court clearly did that. And so we think that the appeal is frivolous on all counts. Okay. I'm happy to answer any additional questions. Further? Anything further? No, Your Honor. All right. Thank you very much. Thank you. Mr. Ellis, I'll give you a couple minutes on rebuttal. Thank you so much. So, Judge Murphy, let me go back to the standard and address a question, because I don't think that I had addressed it. Well, I don't think my questions ---- I think you'd be better off talking about whether or not compliance was possible, because I was kind of getting to the judge's findings on the foot-dragging, and Judge Kleinfeld and I agree that clearly the judge made his feelings known on that. But was it possible to get the membership together to vote and comply with the order? I think that's where the issues joined. Right. And the membership did get together. There was a vote in May of 2016, and the name was formally changed to the California State Guild. Should we send it back if we find that that's ---- if compliance was not possible, do we send it back to cut the fees, or do we make a fee computation ourselves, or how does that work? So, Your Honor, I'm not challenged. Either the fees, I think, exist at $144,000. I don't think there was any ---- again, I was not the ---- and I don't mean this to sound defensive, because I don't mean it, but I was not the attorney at that time, and there was really no ---- for the Guild at that time, and there's no attack on the reasonableness of the fees per se. It's whether you pass the initial threshold of whether they're entitled or not. And here's what I do want to say in kind of leaving. What we do know about 15 U.S.C. 1117A is it has ---- it's a prevailing party, obviously, but it's not prevailing party reasonableness. It has a threshold. It says it has to be exceptional, and the question is may. That's the term that is used in there. So it's ---- we know that it's always discretionary. And so when I look at the cases, and there's one cited in my brief, and for the life of me right now, Your Honors, I can't think of the name, but I think it was a ---- it was a case where in the infringement area, in the trademark infringement, people had entered into an agreement not to infringe, not to use the same name. It went on for three years. And in that case, whatever standard you wanted to use, you would say that that was an exceptional circumstance. But I do think that it's got to be something more than you win, or you get an injunction, or even you get some damages for this to be taken out and put into an exceptional circumstance. Alito, was there any argument made to the district judge that compliance is impossible until we get a vote of membership? Well, yeah, sure. It was in the briefs. And so ---- To the district judge? Yeah, to Judge Shub. Yeah, it was in the briefs dealing with, at least with the contempt motion. And hold on, Your Honor. You know, because we have a lot of the same evidence going in front of the court, first in front of the contempt, and then again a month or a month and a half later in terms of the injunctive relief. But, Judge Kleinfeld, if you go to Excerpt of Record 435, you're going to see those arguments. You're going to see the factual bases that support that. You will see that the guilds, what is now the guilds records, and bylaws are in there. I would also say if you look at Excerpts of Record 283, 298 through 303, 286, 288 through 297, you're going to see all of this evidence that weighed against willfulness. And, Your Honors, let me just ---- I don't have any problem with the district judge resolving that. He weighed the evidence for and against, and he thought it was willful and deliberate. And for all I know, the district judge thought, well, this argument that they needed a vote of the membership, it really didn't matter. They just weren't trying to comply. They were trying to avoid compliance. And that may be what he thought. I don't know that, because all I see in the three pages is the evidence against us and none of the evidence for us. And I cite a Fifth Circuit court of appeals, United States court of appeals case, where, at least in that circuit, they say that they want a judge to fully document on the record what his reasoning is for and against. This is what I started to say during the first part of my argument. I'm not asking for that type of standard, but it would have been helpful here. Thank you all so much. I appreciate your patience. Thank you. Absolutely. The case just argued is submitted, and we'll get you an answer as soon as we can. We are adjourned.
judges: Kleinfeld, Tallman, Murphy